

# NUMBER 13-20-00067-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

AHMAD ZABIHIAN, NEW WORLD CAR
NISSAN, INC. D/B/A WORLD CAR
HYUNDAI, AND NEW WORLD CAR
IMPORTS – SAN ANTONIO, INC.,                              Appellants,

v.

HYUNDAI MOTOR AMERICA AND ROGER
BEASLEY IMPORTS, INC. D/B/A ROGER
BEASLEY HYUNDAI – NEW BRAUNFELS,                          Appellees.

## On appeal from the 438th District Court
## of Bexar County, Texas.

# MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Benavides and Silva**
**Memorandum Opinion by Chief Justice Contreras**

This is an appeal from a take-nothing judgment following a jury trial in a business

dispute. Appellants Ahmad Zabihian, New World Car Nissan, Inc. d/b/a World Car

Hyundai, and New World Car Imports – San Antonio, Inc. (collectively Zabihian) challenge the judgment rendered in favor of appellees, Hyundai Motor America (HMA) and Roger Beasley Imports, Inc. d/b/a Roger Beasley Hyundai – New Braunfels (Beasley). By three issues, Zabihian argues: (1) the trial court erred in interpreting the phrase "first right of refusal," as used in the contract between the parties, as equivalent to the phrase "right of first refusal"; (2) the evidence was factually insufficient to support the judgment; and (3) the trial court erred in denying his motion for new trial. We affirm.[1]

## I. BACKGROUND

In 2013, Zabihian sued HMA and Beasley for breach of contract and tortious interference with an existing contract, respectively. His original petition alleged that he purchased an existing Hyundai dealership in 1999, and at the time, the only other Hyundai dealership in the San Antonio area was owned by Red McCombs. According to the petition, HMA permitted Zabihian to open a second San Antonio-area Hyundai dealership in 2001, on condition that he obtain Red McCombs's agreement to waive its statutory right to object to the opening. *See* TEX. OCC. CODE ANN. § 2301.652(b) (stating that a franchised dealer may protest to the Texas Department of Motor Vehicles if an application is filed by a dealer "of the same line-make" to establish a dealership in the same county or within a fifteen-mile radius). Zabihian alleged that, in 2005, HMA awarded two new San Antonio-area dealerships to McCombs without notifying Zabihian or asking him to waive his right to protest. Zabihian complained to Rick Leuders, HMA's regional manager, who agreed that, in exchange for Zabihian's agreement not to protest McCombs's new

---

[1] This appeal was transferred to this Court from the Fourth Court of Appeals in San Antonio pursuant to an order issued by the Texas Supreme Court. *See* TEX. GOV'T CODE ANN. § 73.001.

dealerships, HMA would offer Zabihian the next two new dealership opportunities in the San Antonio region.

On May 1, 2006, Leuders sent a letter to Zabihian memorializing their agreement. The letter stated that Zabihian had a "First Right of Refusal" on the next two "additional points," or new dealership opportunities, that arise in the region for seven years.[2] Zabihian alleged in his petition that HMA breached this agreement by offering a New Braunfels dealership to Beasley in 2013, after Leuders was replaced as regional manager by Tom Hetrick. Zabihian later filed an amended petition adding his companies as named plaintiffs and adding a fraudulent inducement claim against HMA. The amended petition alleged that, in addition to the dealership offered by HMA to Beasley in 2013, there were two other "open points" in the San Antonio area during the term of the agreement which HMA should have offered to Zabihian. The petition requested damages as well as injunctive and declaratory relief.

---

[2] The May 1, 2006 letter read as follows:

Per our conversation, at an earlier meeting, and based upon our mutual agreement:

Let this letter serve as a 'Letter of First Right of Refusal' for additional points in the San Antonio ADI [area of dominant influence]. From the date of this letter, specifically the dealer would have first right of refusal of points in the ADI that include, San Antonio, Boerne, and New Braunfels. This condition applies only on add points. This does not apply to any buy/sells presented to Hyundai. This letter remains in force for seven years. Dealer must execute on the following five conditions:

1.      You are still a Hyundai dealer in good standing financially.

2.      As a dealer, you cannot own or have a controlling interest in more than three dealers in the San Antonio ADI to exercise your right of first refusal.

3.      Any protest required by the add point, would be contended with the State of Texas, and the affected dealer would be your responsibility. Hyundai would clear the Boerne protest.

4.      Per our mutual agreement at an earlier date, dealer agrees to waive the current add points for Red McCombs at I-10 and 1604 and also on San Pedro Avenue.

This agreement must remain confidential and failure to do that will result in the change of this agreement.

3

Following a two-week trial, the jury was asked in Question No. 1 of the charge: "On or before May 1, 2013, was there: (1) an offer for [Beasley] to add a [Hyundai] dealership in New Braunfels, (2) with the usual terms for adding a dealership, and (3) with intent by [HMA] to offer the dealership to [Beasley]?" The jury answered "No" to Question No. 1. Therefore, it was instructed not to answer Question No. 2, which asked whether HMA failed to comply with the terms of the agreement; Question No. 3, which asked whether HMA's breach was excused by Zabihian's prior material breach; or Question No. 6, which asked whether Beasley intentionally interfered with the agreement. The jury further found that: (1) HMA did not fraudulently induce Zabihian into making the agreement; and (2) Beasley did not know, on or before May 1, 2013, of the existence of the agreement. The trial court rendered a take-nothing judgment in accordance with the jury's findings on September 10, 2019.

Zabihian filed a motion for new trial, arguing in part that the jury "deliberated under arbitrary and unreasonable time constraints which prevented it from fully and fairly weighing the evidence" and worked to his disadvantage. The motion for new trial was denied by operation of law, *see* TEX. R. CIV. P. 329b(c), and this appeal followed.

## II.   DISCUSSION

### A.   "First Right of Refusal"

By his first issue, Zabihian contends that the trial court erred by construing the phrase "first right of refusal" as equivalent to the more familiar phrase "right of first refusal," which is commonly encountered in the real estate context.

> A right of first refusal, also known as a preemptive or preferential right, empowers its holder with a preferential right to purchase the subject property on the same terms offered by or to a bona fide purchaser. Generally, a right of first refusal requires the grantor to notify the holder of

4

his intent to sell and to first offer the property to the holder on the same terms and conditions offered by a third party. When the grantor communicates those terms to the holder, the right ripens into an enforceable option. The holder may then elect to purchase the property according to the terms of the instrument granting the first-refusal right and the third party's offer, or decline to purchase it and allow the owner to sell to the third party.

*Archer v. Tregellas*, 566 S.W.3d 281, 286–87 (Tex. 2018) (internal citations and quotations omitted); *see Tenneco Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 644 (Tex. 1996).

HMA filed a pre-trial "Motion to Determine That Contract Terms Are Not Ambiguous," asking the trial court to conclude as a matter of law that the terms "First Right of Refusal" and "add points," as used in Leuders' May 1, 2006 letter, were unambiguous. *See* TEX. R. CIV. P. 248 (providing that questions of law "shall, as far as practicable, be heard and determined by the court before the trial commences"). Specifically, HMA contended that "First Right of Refusal" was unambiguously equivalent to "right of first refusal," and that "add points" unambiguously referred to "new dealerships awarded by HMA to a specific dealer when HMA decides to activate a point pursuant to specific terms and conditions." HMA argued that the term "add points" does not include all "open point[s]," which is the "identification of potential future [dealership] locations." It further contended that, because these terms are unambiguous, parol evidence is inadmissible to prove the parties' intent. *See Friendswood Dev. Co. v. McDade & Co.*, 926 S.W.2d 280, 283 (Tex. 1996) (per curiam) ("Only after a contract is found to be ambiguous may parol evidence be admitted for the purpose of ascertaining the true intentions of the parties expressed in the contract.").

Zabihian filed a response to the motion in which he agreed that the terms were unambiguous but disagreed as to what they meant. Zabihian contended that, according

to testimony by himself and Leuders, the parties contemplated that the term "additional point" "unambiguously required [HMA] to offer points that did not previously exist when those points were identified in San Antonio, Boerne, and New Braunfels, to [Zabihian] (as opposed to existing points that may be privately sold by one dealer to another, a 'buy/sell')."[3] As to "right of first refusal," Zabihian argued that this language "unambiguously establishes [HMA]'s obligation under the contract to offer [Zabihian] two add points when they became available during the 7-year term of the contract."

After a hearing, the trial court ruled that the terms "additional points" and "add points" were ambiguous, but the term "first right of refusal" was unambiguous. On appeal, Zabihian argues that the latter ruling was erroneous. He contends that, pursuant to the court's ruling, his rights under the agreement would only be triggered if: (1) Beasley was offered a point in New Braunfels; (2) "with all necessary terms for adding the point (which [Zabihian] could not possibly match or beat)"; and (3) HMA intended to offer the point to Beasley. Zabihian argues that is an "absurd and impossible" result because "it would not have been possible for [him] to ever match the terms" which were required of Beasley under its agreement with HMA. In support of this argument, Zabihian points to a letter of intent sent by HMA to Beasley on October 14, 2013, which formally advised Beasley that it had been approved as an authorized Hyundai dealer in the New Braunfels area. The letter required Beasley to, among other things, renovate the specific property it had purchased along Interstate 35 in New Braunfels "to meet Hyundai's minimum facility

---

[3] Zabihian acknowledged that the parol evidence rule bars consideration of evidence which contradicts, varies, or adds to the terms of an unambiguous agreement. Nevertheless, citing *Barrow-Shaver Resources Co. v. Carrizo Oil & Gas, Inc.*, he argued that "evidence of circumstances [surrounding the formation of the contract] can be used to 'inform the contract text and render it capable of only one meaning.'" 590 S.W.3d 471, 483 (Tex. 2019).

6

standards and brand identification requirements" before the end of 2014. Zabihian argues that it would have been impossible for him to satisfy those terms because Beasley already owned the specific property mentioned in the letter. *See, e.g.*, *Dewhurst v. Gulf Marine Inst. of Tech.*, 55 S.W.3d 91, 97 (Tex. App.—Corpus Christi–Edinburg 2001, pet. denied) ("A construction which renders performance of the contract possible will be adopted, rather than one which renders its performance impossible or meaningless, unless the latter construction is absolutely necessary . . . ."). He contends that, contrary to the court's ruling, the parties "clear[ly]" intended "that HMA was obligated to offer [Zabihian] two points when they became available during the seven-year term of the Contract, and [Zabihian] would have the first right to refuse (or accept) each point."

In response, HMA contends that Zabihian waived the issue by (1) failing to object to Question No. 1 of the jury charge, and (2) failing to submit a charge question reflecting its preferred interpretation of the phrase at issue. To the extent Zabihian's first issue challenges the inclusion of Question No. 1 in the jury charge, we agree. "[A] party waives an entire theory of recovery or defense by not objecting to its omission from the charge." *Gulf States Utils. Co. v. Low*, 79 S.W.3d 561, 565 (Tex. 2002). And "[f]ailure to submit a question shall not be deemed a ground for reversal of the judgment, unless its submission, in substantially correct wording, has been requested in writing and tendered by the party complaining of the judgment." TEX. R. CIV. P. 278; *see* TEX. R. CIV. P. 279 ("Upon appeal all independent grounds of recovery or of defense not conclusively established under the evidence and no element of which is submitted or requested are waived."); *see also* TEX. R. APP. P. 33.1(a)(1). Zabihian did not object to the jury charge on any grounds. Moreover, though Zabihian advocated for his preferred interpretation in

7

his response to HMA's pre-trial motion, he did not submit a proposed charge question asking whether HMA "was obligated to offer [Zabihian] two points when they became available," nor did he submit a question asking whether HMA violated any such obligation.

Additionally, to the extent that Zabihian's first issue challenges the trial court's pre-trial ruling on HMA's "Motion to Determine That Contract Terms Are Not Ambiguous," Zabihian has not explained how that ruling caused an improper judgment or prevented him from properly presenting the case on appeal. *See* TEX. R. APP. P. 44.1(a) (standard for reversible error in civil cases). In particular, he does not explain whether or how the judgment would have been different if the trial court had adopted his preferred construction of the phrase at issue.

Even if the issue were preserved and shown to involve potentially reversible error, it would lack merit. "In construing a contract, a court must ascertain the true intentions of the parties as expressed in the writing itself." *Kachina Pipeline Co. v. Lillis*, 471 S.W.3d 445, 450 (Tex. 2015). We may consider the facts and circumstances surrounding a contract, including "the commercial or other setting in which the contract was negotiated and other objectively determinable factors that give context to the parties' transaction." *Id.* (citing *Americo Life, Inc. v. Myer*, 440 S.W.3d 18, 22 (Tex. 2014)). But while evidence of circumstances can be used to inform the contract text and render it capable of only one meaning, extrinsic evidence can be considered only to interpret an ambiguous writing, not to create ambiguity. *Id.* (citing *Friendswood Dev. Co.*, 926 S.W.2d at 283). "A contract is not ambiguous simply because the parties disagree over its meaning." *Dynegy Midstream Servs., Ltd. P'ship v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex. 2009). Rather, "[i]f a written contract is so worded that it can be given a definite or certain legal meaning,

8

then it is not ambiguous." *Kachina Pipeline Co.*, 471 S.W.3d at 450.

The agreement at issue in this case, memorialized in Leuders' May 1, 2006 letter, provided that Zabihian would have the "first right of refusal" for "additional points" in the San Antonio region for seven years. Zabihian argues that the term "first right of refusal" carries a different meaning than the more familiar term "right of first refusal"—specifically, he appears to contend that the former right is triggered whenever a dealership opportunity "opens," whereas the latter right would be triggered only when an intentional offer is made to a third party, such as Beasley. But the May 1, 2006 letter itself uses the terms "first right of refusal" and "right of first refusal" interchangeably, strongly indicating that the parties intended the terms to be equivalent.

As noted, Zabihian also argued that the trial court's interpretation would lead to an absurd result because it would be impossible for him to "match the terms" required of Beasley in its agreement with HMA. But the "terms" which Zabihian refers to were not presented to Beasley until after the seven-year contract period expired. Moreover, under the trial court's interpretation, Zabihian did not need to establish that he could perform the *exact* terms later required of Beasley (such as renovating the *exact* property in New Braunfels on which Beasley intended to build its dealership) in order to show that his right of first refusal had ripened into an enforceable option. Instead, consistent with the language in Question No. 1, Zabihian merely had the burden to show that HMA intentionally made an offer within the seven-year period to Beasley "with the usual terms for adding a dealership"—if so, HMA would have been required to first offer Zabihian those same "usual terms for adding a dealership." It would not have been impossible for Zabihian to comply with those terms, and so the trial court's interpretation of the parties'

9

agreement does not generate an absurd result.

Zabihian's first issue is overruled.

## B.    Factual Sufficiency

Zabihian argues by his second issue that the jury's answers on breach of contract, fraudulent inducement, and tortious interference were contrary to the great weight and preponderance of the evidence—in other words, he contends the evidence was factually insufficient to support the judgment. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (per curiam) (citing *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983)). When a party attacks the factual sufficiency of the evidence supporting an adverse finding on an issue on which it had the burden of proof, as here, we consider and weigh all of the evidence and will set aside a verdict only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Id.* (citing *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986)). In conducting our review, we may not merely substitute our judgment for that of the jury. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). The jury is the sole judge of the credibility of witnesses and the weight to be given to their testimony. *Id.*

### 1.    Breach of Contract

First, as to breach of contract, Zabihian does not state that he is challenging the evidence to support any particular finding made by the jury. Instead, he simply argues that the great weight of the evidence supports a finding that HMA breached its agreement with him. *See USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 502 n.21 (Tex. 2018) (noting that the essential elements of a breach of contract action are: "(1) the existence of a valid contract; (2) the plaintiff performed or tendered performance as the contract

required; (3) the defendant breached the contract by failing to perform or tender performance as the contract required; and (4) the plaintiff sustained damages as a result of the breach").

HMA contends that Zabihian waived this issue because the jury did not answer charge Question No. 2—which directly asked whether HMA complied with the agreement—and because Zabihian did not object to the instruction directing the jury not to answer Question No. 2 if it answered "No" to Question No. 1. *See Bay Petroleum Corp. v. Crumpler*, 372 S.W.2d 318, 320 (Tex. 1963) (holding that, "by failing to object to the conditional submission of [two charge questions,] the plaintiffs waived their right to have them answered; and under the provisions of Rule 279, Texas Rules of Civil Procedure, there is a deemed finding in support of the court's judgment"). We agree that any factual sufficiency issue regarding Question No. 2 of the charge has been waived. Rather than rejecting the entire issue, however, we will construe this part of Zabihian's second issue as challenging the factual sufficiency of the evidence supporting the jury's response to Question No. 1 of the charge. *See Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000) (noting that in a civil case, "it is the court's charge, not some other unidentified law, that measures the sufficiency of the evidence when the opposing party fails to object to the charge").

As noted, Question No. 1 asked: "On or before May 1, 2013, was there: (1) an offer for [Beasley] to add a [Hyundai] dealership in New Braunfels, (2) with the usual terms for adding a dealership, and (3) with intent by [HMA] to offer the dealership to [Beasley]?" Zabihian argues that there was evidence that HMA offered an open point in New Braunfels to Beasley prior to May 1, 2013, when the "First Right of Refusal" agreement

11

expired. He points to his own testimony that, before the agreement was put in writing, Leuders told him "I'm going to give you guys two more dealerships." Zabihian testified that his relationship with HMA deteriorated when Hetrick took over as HMA's regional manager, and he directs us to testimony establishing that a meeting took place in September 2012 between Hetrick, HMA's CEO Dave Zuchowski, and Beasley's managing partner Jim Bagan. Bagan testified that, at this meeting, Hetrick and Zuchowski told him that there was an open "point" in the region and that it would be offered to Beasley. Additionally, HMA executive Larry Caudill testified that there was an open point in New Braunfels which was not offered to Zabihian. Finally, Zabihian notes that Beasley purchased the New Braunfels real property upon which it intended to build its dealership before May 1, 2013. In response, HMA notes that Zabihian testified that he spoke to Gary Woods, Red McCombs' president, about Zabihian's "first right of refusal" in 2011; HMA contends that the jury could have believed this testimony and concluded that Zabihian himself breached the agreement by failing to maintain confidentiality. HMA also notes that both Hetrick and Zuchowski testified that HMA honored the agreement.

Viewing all the evidence, we cannot say that the jury's answer to Question No. 1 was against the great weight and preponderance of the evidence. Although there was testimony that HMA negotiated with Beasley prior to the May 1, 2013 expiration of Zabihian's right of first refusal, there was no evidence showing that a formal offer was made by HMA to Beasley before that date. And though there was evidence there was an "open point" in New Braunfels which was not offered to Zabihian, the jury was not asked whether this occurred, and for the reasons explained above, Zabihian cannot now challenge the sufficiency of the evidence to support the jury's answer to a question which

was never asked.[4]

### 2.  Fraudulent Inducement

Zabihian next argues that the evidence was factually insufficient to support the jury's negative finding on his fraudulent inducement cause of action. Fraudulent inducement is a species of common-law fraud with the following elements: "(1) a material misrepresentation, (2) made with knowledge of its falsity or asserted without knowledge of its truth, (3) made with the intention that it should be acted on by the other party, (4) which the other party relied on and (5) which caused injury." *Anderson v. Durant*, 550 S.W.3d 605, 614 (Tex. 2018). "Fraudulent inducement is actionable when the misrepresentation is a false promise of future performance made with a present intent not to perform." *Id.*

Zabihian contends that there was circumstantial evidence that Leuders knowingly made material false representations with the intent to induce him into signing the agreement. In particular, Zabihian points to testimony by Zuchowski and Caudill that the agreement made by Leuders was "counter to our policy" and that the May 1, 2006 letter was "concerning" because it "restricted [HMA's] ability to take any actions in the market." Caudill stated that the letter was "so unusual" that he pinned it to a bulletin board to make sure that HMA was not "talking to anybody about an add point in any of those markets and to be aware of when it did expire."

Additionally, the following colloquy occurred during Hetrick's testimony:

---

[4] Zabihian also contends that he and Leuders "understood the Contract to have required at least one additional point for [Zabihian] between May 1, 2006 and May 1, 2013." We do not find any evidence supporting this proposition. In any event, the jury was not asked whether the parties' agreement "required at least one additional point" to be granted to Zabihian during the seven-year period. Zabihian has never argued—in his response to HMA's pre-trial motion, at the charge conference, or at any other point in the trial court—for this interpretation of the contract.

13

Q. [Zabihian's counsel]    Did you intend, beginning in the summer of 2010, to comply with the terms of [the May 1, 2006 letter] with care, skill, reasonable expedience and faithfulness?

A. [Hetrick]    No.

Q.    Why not?

A.    No one used those terms or phrases with me at all.

Q.    Once that has occurred, did you understand that HMA and you, as the regional general manager, had a duty to cooperate with Mr. Zabihian and the World Car Hyundai franchises in San Antonio to achieve the purpose of the agreement?

A.    We were told to honor the agreement.

Hetrick also testified that he met with Zuchowski in the summer of 2010 to discuss the letter, and at the meeting "[i]t was determined that we should honor the letter." Zabihian argues that Hetrick's statements, combined with the other evidence, shows that "HMA did not originally intend to comply with the Contract."

In response, HMA observes that Leuders testified he did not "trick or deceive" Zabihian when he wrote and sent the May 1, 2006 letter. Further, Zabihian testified as follows at trial:

Q. [HMA's counsel]    All right. So are you telling the jury now that [Leuders] told you one thing and wrote something else down? You're not telling us that, are you?

A. [Zabihian]    No, sir.

. . . .

Q.    Okay. So just to put a bow on this, you're not saying Rick Leuders defrauded you, are you?

A.    No, sir.

Q.    Because he didn't defraud you, did he?

14

A.          No, he did not.

Q.          He didn't misrepresent anything to you, did he?

A.          No, sir.

Q.          All right. He didn't lie to you in any way, did he?

A.          No, he did not.

Q.          And he did not falsify anything to you, did he?

A.          No, sir.

HMA further notes that jury charge Question No. 4, concerning fraudulent inducement, instructed the jury that "[t]he same corporate agent must commit elements 1, 2 and 3 of fraud[5] before the corporation may be held liable for the fraud." It argues that Zabihian's testimony alone supports the jury's negative answer to Question No. 4, especially considering the instructions in the charge. *See Osterberg*, 12 S.W.3d at 55 (providing that we measure evidentiary sufficiency according to the elements as defined in the jury charge actually submitted).

Again, we cannot conclude that the jury's finding was against the great weight and preponderance of the evidence. Under the jury charge as issued, Zabihian had to show that the same agent of HMA made a misrepresentation, with recklessness or without

---

[5] The jury charge defined the elements of fraud as follows:

1.          a party makes a material misrepresentation, and

2.          the misrepresentation is made recklessly without knowledge of its falsity or made without any knowledge of the truth and as a positive assertion, and

3.          the misrepresentation is made with the intention that it should be acted on by the other party, and

4.          the other party actually and justifiably relies on the misrepresentation and thereby suffers injury.

"Misrepresentation" means a promise of future performance made with an intent, at the time the promise was made, not to perform.

15

knowledge of the truth, and with the intent that Zabihian act on it. Though fraudulent intent is usually established by circumstantial evidence, *see, e.g.*, *In re Lipsky*, 460 S.W.3d 579, 588 (Tex. 2015), the jury is the sole arbiter of the credibility of witnesses, and it could have believed the testimony of Leuders and Zabihian that Leuders did not lie or intend to deceive Zabihian into signing the agreement. *See Golden Eagle Archery*, 116 S.W.3d at 761. There was no evidence that any other agent of HMA did anything to entice Zabihian into entering the agreement.

### 3.      Tortious Interference

The final part of Zabihian's second issue argues that the evidence was factually insufficient to support the rejection of his tortious interference claim against Beasley. Beasley contends the issue was waived because the jury did not answer Question No. 6, and because Zabihian did not object to the instruction which made Question No. 6 conditional on other findings.

We agree that the issue has been waived. Charge Question No. 6 asked whether Beasley "intentionally interfere[d]" with the May 1, 2006 letter,[6] but the jury was instructed to answer that question only if it had already answered "Yes" to Questions No. 2 (asking whether HMA breached the contract) and No. 5 (asking whether Beasley knew, on or before May 1, 2013, of the contract's existence). The jury did not answer Question No. 2, which itself was conditional on an affirmative finding on Question No. 1, and it answered

---

[6] Question No. 6 was accompanied by the following instruction:

Interference is intentional if committed with the desire to interfere with the contract or with the belief that interference is substantially certain to result. Interference is not merely inducing a contract obligor to do what it has the right to do. Interference is tortious only if it is intentional, and the intent required is the intent to interfere, not just an intent to do the particular acts done. Interference requires that the defendant be more than a willing participant; it must knowingly induce one of the contracting parties to breach its obligations.

16

"No" to Question No. 5.

We have already concluded that the evidence was factually sufficient to support the jury's "No" answer to Question No. 1. Therefore, based on the instructions, the jury correctly declined to answer Questions No. 2 and No. 6. Zabihian argues the great weight and preponderance of the evidence supported his tortious interference claim against Beasley, but similar to his argument concerning breach of contract, he cannot now challenge the sufficiency of the evidence to support a finding which the jury never made. And because Zabihian did not object to the charge on any grounds, he cannot complain about the conditional nature of Question No. 6 on appeal. *See Bay Petroleum Corp.*, 372 S.W.2d at 320; *see also* TEX. R. APP. P. 33.1(a)(1).

Zabihian's second issue is overruled.

## C.      Motion for New Trial

By his third and final issue, Zabihian alleges that his motion for new trial should have been granted because "the jury deliberated under arbitrary and unreasonable time constraints" which "prevented it from fully and fairly weighing the evidence." A trial court may grant a motion for new trial upon good cause shown. TEX. R. CIV. P. 320. We review a ruling on a motion for new trial for abuse of discretion. *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 813 (Tex. 2010). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles. *Crawford v. XTO Energy, Inc.*, 509 S.W.3d 906, 911 (Tex. 2017).

The record shows that, after the parties concluded their closing arguments in the late afternoon of Thursday, August 29, 2019, the trial court excused the alternate juror and instructed the remaining jurors to begin their deliberations. At that point, a juror

17

informed the trial court that he needed to leave court early in the afternoon the following day in order to take care of his two young children. The trial court asked the juror whether he had discussed with the rest of the jury the possibility of recessing at 1:15 or 1:30 p.m. on Friday and reconvening the following Tuesday if deliberations were still ongoing; the juror replied, "I don't think anybody wants to come back on Tuesday."[7] After the juror exited the courtroom, the trial court conferred with the attorneys about the situation, suggesting that the jury may need to return the following week, or alternatively, the alternate juror could be recalled to replace the juror with the scheduling conflict. Eventually, the court proposed submitting the following note to the jury:

> It has come to the Court's attention that one of you has a schedule conflict tomorrow. I would ask that you all confer on a schedule that works for the group. Please consider coming earlier and working through lunch. The Court will provide breakfast and lunch to accommodate you. Please do your best to resolve your individual schedule commitments so you can continue your duties to this [C]ourt. Please advise how late you intend to deliberate this evening and how early you intend to start in the morning.

The parties each affirmatively stated that they had no objection to the note. After a recess, the trial court received a reply signed by the presiding juror. The court stated: "Okay. So the note we received back says 'We have decided to stay today until 5:30 p.m. We will meet at 9:00 a.m. to 12:00 p.m. with hopes of reaching a verdict tomorrow, August 30th, 2019.' So I guess they understand if they don't, they'll be coming back." The jury was then dismissed for the day at 5:38 p.m.

The record reflects that, at 9:34 a.m. on August 30, the jury submitted a note requesting transcripts from depositions. The court instructed the jury to resume

---

[7] Monday, September 2, 2019, was Labor Day; thus, Tuesday, September 3, 2019, was the business day which immediately followed Friday, August 30, 2019.

deliberating. At 11:43 a.m., the jury submitted a note asking what to do "if 10 of us cannot agree on all 12 questions." In response—and without objection from Zabihian's counsel—the trial court instructed the jury to carefully review the charge instructions as to each question to determine whether the votes needed to be unanimous. The court's note was submitted to the jury at 12:28 p.m. At 12:34 p.m., the presiding juror announced that the jury had reached a verdict. The court recited the verdict and excused the jurors. The parties each declined to poll the jury.

Subsequently, after an hour-long recess, the trial court went back on the record to explain that three jurors had returned into the courtroom after being dismissed in order to speak to the trial court. The trial court stated:

> They wanted to let me know that they felt a lot of pressure to make a decision and that they had wanted more time; that they didn't believe that that was their decision because of the pressure that they felt; that possibly had they had more time, it would have been a different outcome; that some of the other jurors made them feel that they had to make a decision now.
>
> I asked the question, "Do you believe that the outcome would have ended differently?" They said that it's possible that it would have ended with no agreement.

The trial court again thanked the jurors for their service. The court told the jurors that the attorneys may want to talk to them to obtain testimony regarding the pressure they felt.

In his motion for new trial, Zabihian argued in part that the jury "deliberated under an arbitrary and restrictive limit of time, thereby unjustly favoring the defendants." In support of the motion, Zabihian attached an affidavit from one of his attorneys stating in part as follows:

> d. "At or around noon on August 29th, the Court's staff apprised us in open court of the fact that several of the jurors were unavailable to return to deliberate on Tuesday, September 3, 2019.
>
> e. "Because several jurors could not come back the following Tuesday,

19

it appeared that the jurors had the mistaken impression that they had to complete deliberations by noon on Friday.

f. "When made aware of this mistaken impression by the jurors, counsel for Plaintiff asked the Court to please clarify that skipping Tuesday and returning on Wednesday or later in the week was not a problem.

g. "The Court indicated that it was inclined to issue a correction instruction to the jury in order to prevent the jury from deliberating under any misimpressions and false time constraints, but Defendants' counsel objected to the issuance of that correction instruction.

h. "The Court further indicated its intention to issue what essentially was a Dynamite Charge, to which Defendants also objected. However, by not correcting the jury's mistaken belief that they must conclude deliberations by noon on Friday, the jury was essentially put in the same position as if the Court had issued a Dynamite Charge. So while Defendants objected to the issuance of a Dynamite Charge, they also objected to the correction instruction that would have removed the *de facto* Dynamite Charge and the resulting pressure the jury misunderstood to be reality.

i. "Before the Court was able to correct the jury's mistaken belief that deliberations were to conclude by noon on Friday, the jury indicated it had reached a verdict by ringing the Court's buzzer. . . .

k. "We later learned that the first vote was 9–3, with nine (9) of the twelve (12) jurors voting in favor of Plaintiffs. However, as a result of their mistaken belief that they had to conclude deliberations by noon on that Friday, the jurors felt pressured to agree to the 'unanimous' verdict in favor of Defendants.

Zabihian contended that a new trial was warranted due to the jury's mistaken belief that it was required to conclude its deliberations by noon on Friday, August 30, 2019. On appeal, he argues the "time constraints" deprived him of a fair trial because "[i]n order to grant [him] the pecuniary relief [he] sought, the jury would have had to deliberate until a unanimous decision was achieved on four of the questions" and "[s]uch an endeavor would have taken considerable time."

HMA and Beasley offer several arguments in response to this issue, including: (1)

20

the trial court imposed no deadline on the jury to complete its deliberations; (2) internal pressure within the jury to complete deliberations is not a basis for a new trial; (3) Zabihian waived any complaint by failing to object to the trial court's instruction regarding further deliberations and by failing to poll the jury; (4) the statements by the three jurors, as recited into the record by the trial court, may not be considered under the applicable rules; and (5) the statement by Zabihian's counsel that "the first vote was 9–3" in his favor may also not be considered.

We agree with appellees that the trial court did not abuse its discretion by denying the motion for new trial on this basis. Even assuming that the issue was not waived, there was no competent evidence upon which the court could have granted a new trial. Texas Rule of Evidence 606(b) states:

> During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

TEX. R. EVID. 606(b)(1); *see* TEX. R. CIV. P. 327(b) (stating the same rule when new trial is requested on grounds of jury misconduct). The only exceptions to this rule are for testimony "(A) about whether an outside influence was improperly brought to bear on any juror; or (B) to rebut a claim that the juror was not qualified to serve." TEX. R. EVID. 606(b)(2); *see* TEX. R. CIV. P. 327(b). This Court has held that, for purposes of these rules, an "outside influence" "must emanate from outside the jury and its deliberations." *Editorial Caballero, S.A. de C.V. v. Playboy Enters., Inc.*, 359 S.W.3d 318, 324 (Tex. App.— Corpus Christi–Edinburg 2012, pet. denied). Thus, "[p]ersonal pressures felt by jurors to wrap up the deliberations do not constitute outside influences" and may not be the subject

21

of juror testimony. *Id.* at 325 (citing *Rosell v. Cent. W. Motor Stages, Inc.*, 89 S.W.3d 643, 660–61 (Tex. App.—Dallas 2002, pet. denied) (explaining that a statement by the bailiff to jurors that they would have to deliberate another day if they told the court that they were deadlocked was not outside influence); *Perry v. Safeco Ins.*, 821 S.W.2d 279, 281 (Tex. App.—Houston [1st Dist.] 1991, writ denied) (concluding that family pressure to go on vacation was not outside influence); *Kirby Forest Indus., Inc. v. Kirkland*, 772 S.W.2d 226, 234 (Tex. App.—Houston [14th Dist.] 1989, writ denied) (holding that pressure from employers to return to work, and family, recreational, and personal pressures are not outside influences)).

Here, Zabihian did not offer any juror's live testimony or affidavit in support of his new trial motion; instead, he relied on (1) the trial court's representations on the record regarding what the three jurors said after the verdict was announced, and (2) his counsel's affidavit. But to the extent these items were probative as to the new trial motion, they were inadmissible under the rules. In particular, counsel's representations in his affidavit that the jury "mistakenly believed" it was under a strict deliberation deadline and that "the first vote was 9–3" constitute "evidence of a juror's statement" about a "statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict . . . ." TEX. R. EVID. 606(b)(1); *see* TEX. R. CIV. P. 327(b). Moreover, the reporter's record does not support the assertions made in paragraphs (d) through (h) of counsel's affidavit.

Zabihian contends that "the jury deliberated under the auspices of a *de facto* dynamite charge, and—as at least three jurors later indicated—they felt the same kind of

22

pressure a dynamite charge would have produced."[8] Zabihian notes that, while a court is allowed "considerable discretion" with respect to such charges, it has "no authority to insist upon an agreement in order to avoid . . . personal inconvenience to the jurors." *Mo., Kan. & Tex. Ry. Co. of Tex. v. Barber*, 209 S.W. 394, 395 (Tex. Comm'n App. 1919). He argues that a new trial should be granted when "circumstances interfere[] with the jury's ability to fully and fairly weigh the evidence." That may be true in principle, but no such interference occurred here. The court did not issue an *Allen* charge, nor did it instruct the jury to finish its deliberation by a particular time. Under these circumstances, we cannot say the trial court abused its discretion by denying Zabihian's motion for new trial.

We overrule Zabihian's third issue.

### III.  CONCLUSION

The trial court's judgment is affirmed.

DORI CONTRERAS
Chief Justice

Delivered and filed on the
2nd day of September, 2021.

---

[8] A "dynamite charge," or "*Allen* charge," is a supplemental charge that may be given to a jury that declares itself deadlocked. *Barnett v. State*, 189 S.W.3d 272, 277 n.13 (Tex. Crim. App. 2006); *see Allen v. United States*, 164 U.S. 492, 501 (1896). It reminds the jury that if it is unable to reach a verdict, a mistrial will result, the case will still be pending, and there is no guarantee that a second jury would find the issue any easier to resolve. *Barnett*, 189 S.W.3d at 277 n.13 (citing *Allen*, 164 U.S. at 501). While such a charge is permissible, trial courts must be careful to word it and administer it in a non-coercive manner. *Id.* (citing *Lowenfield v. Phelps*, 484 U.S. 231, 237 (1988) (noting that a supplemental *Allen* charge must be considered "in its context and under all the circumstances" to determine whether it improperly coerced the jury)); *see Hollie v. State*, 967 S.W.2d 516, 524 (Tex. App.—Fort Worth 1998, pet. ref'd) ("Because of the unpredictable and potentially undermining effects of deadlines given by a trial judge during a jury's deliberations, such action is highly discouraged and should be generally avoided.").